UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MASSACHUSETTS

ANABELA CARVALHO, ANTHONY
GITTLES, LAWRENCE PIETRUCCI,
RICHARD LaFLECHE, and ROBERT
VIEU,

                    Plaintiffs,

vs.

MEADWESTVACO CORPORATION and
UNION, PAPER, ALLIED-INDUSTRIAL,
CHEMICAL & ENERGY WORKERS
INTERNATIONAL UNION, LOCAL 10001
AND ITS INTERNATIONAL,

                    Defendants.

CIVIL ACTION NO. 05-30020-MAP

**MEADWESTVACO CORPORATION'S
MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS COUNT II**

## I.  Introduction

Plaintiffs have filed a four count complaint against the MeadWestvaco

Corporation (hereinafter "the Company" or "MeadWestvaco"), which formerly employed

the Plaintiffs.  Also named as a Defendant is the Paper, Allied-Industrial, Chemical &

Energy Workers International Union, Local 10001 and its International ("PACE") which

represented certain of the Company's employees, including the Plaintiffs.  In separate

counts, each defendant is charged with violating the Americans with Disabilities Act and

M.G.L. Ch. 151B.  The dispute arises from the fact that Plaintiffs, none of whom could

work more than eight hours in a day, were not allowed to transfer to the Company's

Enfield, Connecticut facility when the Company closed its Massachusetts manufacturing

facilities.  (Complaint ¶¶ 20, 59, 63)

Following the filing of a Motion to Dismiss by the Company, Plaintiffs'

administrative charges were dismissed by the Massachusetts Commission Against

Discrimination, which found that inasmuch as the alleged discriminatory acts occurred

at a facility located in Enfield, Connecticut, it had no jurisdiction.  Defendant, MeadWestvaco, has filed a Motion to Dismiss[1] seeking dismissal of Count II, alleging that it violated M.G.L. Ch. 151B.  Defendant asserts that the claim fails to state a claim upon which relief may be granted.

At the core of this Motion is the simple legal fact that M.G.L. Ch. 151B does not, and indeed constitutionally cannot, apply to regulate foreign employers in the operation of their facilities outside the borders of the Commonwealth of Massachusetts[2]. Secondly, the claims are preempted by federal labor law, since the transfer rights were the subject of collective bargaining mandated by federal law.

## II.  Massachusetts Has Not, And Cannot, Sought to Apply M.G.L. Ch. 151B to Employment Actions Pertaining To Facilities In Other States

MeadWestvaco Corporation is headquartered in Stamford, Connecticut.  In September 2002, it announced the closing of its Massachusetts facilities where Plaintiffs were employed.  As alleged in the Complaint, following negotiations between the co-Defendants, some employees were allowed to transfer to the Enfield, Connecticut

---

[1]Ordinarily a court only considers the pleadings in ruling on a Rule 12(b)(6) motion to dismiss.  If the court considers evidence outside of the pleadings, the motion is converted to a motion for summary judgment.  Fed. R. Civ. P. 12(b).  In Beddall v. State Street Bank and Trust Co., 137 F.3d 12 (1st Cir. 1998), the First Circuit adopted an exception to this rule.  Under this exception, "[w]hen ... a complaint's factual allegations are expressly linked--and admittedly dependent upon--a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."  Beddall, 137 F.3d at 17.  Moreover, an MCAD Charge may be considered on a motion to dismiss because it is a public document.  See, Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  The same would seemingly be true for the MCAD's Notice of Dismissal, a copy of which is attached hereto as Exhibit 1, with counsel's representation that the remaining charges were likewise disposed of by the Commission.  In the alternative, the court may treat this as a Partial Motion for Summary Judgment.

[2]This is not the case where employees working in Massachusetts for a Massachusetts employer are temporarily out of the state traveling, and thus remain subject to M.G.L. Ch. 151B. The Massachusetts facilities where the Plaintiff's formerly worked were permanently shut down. The issue presented by this Motion is whether a Massachusetts statute, M.G.L. Ch. 151B, can serve as the basis to compel an Enfield facility to make accommodations for individuals, based on M.G.L. Ch. 151B.

facility which, Defendant submits[3], operated in a different manner, and thus, had different job requirements than had existed at the Massachusetts plants.  Thus, it is alleged, and to a considerable degree admitted, that Plaintiffs were not allowed to obtain alternative positions in Enfield because they were unable to work the twelve hour shifts required for any employee to be hired to work the Continuous Operations schedule utilized at Respondent's Enfield facility.

The Plaintiffs' claim that the refusal to hire them because they were incapable of working a twelve hour shift is disability/handicap discrimination.  Of course, to establish that this decision by Respondent was an act of disability/handicap discrimination, the Complainant will have to prove, *inter alia*, that they were each "handicapped" within the meaning of the law.  If they can establish that, the issue, given their acknowledged inability to work twelve hour shifts, becomes whether this Enfield, Connecticut facility was legally obligated to disregard or accommodate the Plaintiffs' inability to work a twelve hour shift.

Those questions, respectfully, are not, and cannot be, controlled by the application of M.G.L. Ch. 151B.  As discussed below, the Massachusetts Legislature has not sought to impose its workplace standards on facilities operating outside of its borders, in Enfield, Connecticut.  Indeed, the Massachusetts Legislature probably could not have done so even if it wanted to.  *See, e.g.,* <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559, 571-72, 116 S. Ct. 1589, 134 L.Ed.2d 809 (1996) ("it follows from . . . principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing . . . lawful conduct in other States.").

---

[3]This factual assertion is not critical, or even material, to the determination of the Motion to Dismiss, but is provided solely so the court can understand the perspective of the parties, and the issues that will likely proceed to discovery under the A.D.A. claim.

The possibility that employment actions that are lawful in Connecticut (or most of the country for that matter) may still violate the handicap discrimination provisions of M.G.L. Ch. 151B, if the Massachusetts law were applicable, is no obscure possibility, but a practical reality.  Thus, M.G.L. Ch. 151B at least in some ways differs from its counterparts in other states, as well as its federal counterpart.  Some of these differences are quite fundamental.  This could include, for example, such a basic issue as who is a handicapped/disabled individual covered by the protections of the law.  Take for example, an individual with an otherwise substantially limiting medical condition that has been fully alleviated by the use of corrective devices or other mitigating measures.  Under the Americans with Disabilities Act (and most state laws), that person can lawfully be terminated without violating any ban on disability discrimination, since he is not a disabled person within the meaning of the A.D.A.  *See, e.g.,* Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S. Ct. 2139, 144 L.Ed.2d 450 (1999).  The discharge of that same individual, however, might violate the handicap discrimination provisions of M.G.L. Ch. 151B where that statute is applicable, since the effect of the ameliorative measures is deemed largely irrelevant under M.G.L. Ch. 151B.  Dahill v. City of Boston Police Department, 434 Mass. 233, 748 N.E.2d 956 (2001).  Massachusetts can, of course, apply its own statute within its own borders, even if that law is inconsistent with the parameters of the ADA.  Massachusetts laws, however, cannot and do not apply its broader definition of handicap to employers operating outside of its boundaries.  An individual cannot, pursuant to M.G.L. Ch. 151B, seek to impose liability on an employer for taking actions (or failing to take actions) that are permissible under the laws of the United States and the state in which they are operating.

This fundamental principal of law is not novel or unsettled.  Rather, Massachusetts courts have long since recognized that neither they, nor other states can impose its statutes on those operating lawfully in other states.  Over a hundred years ago the Supreme Judicial Court noted:

> It is a general rule that a state or nation cannot give its statutes extraterritorial effect . . . it is *contra* to fundamental principles of justice that a state should assume to regulate the conduct of citizens of foreign states who have never been within its borders, and to punish them for acts which were lawful where they were done.

Bradley v. Burton, 151 Mass. 419, 421, 24 N.E. 778 to 779 (1890).  Burton continues to be relied upon and still represents sound law and policy.  *See, e.g.,* Commonwealth v. Miller, 2002 WL 1489613, *5 (Mass. Super.) ("Moreover, applying the statute in this case would require this Court to hold that a Massachusetts statute can regulate the conduct of New York police officers.  The reach of a Massachusetts statute, however, must end at Massachusetts' borders unless the legislature has provided for extra-territorial authority in the statute." *citing*, Howard v. Lombardo, 175 Mass. 572, 573 (1900); Bradley v. Burton, 151 Mass. 419, 421 (1890) ("[i]t is a general rule, that a State or nation cannot give its statutes extra-territorial effect."); Commonwealth v. LeBlanc, 407 Mass. 70, 75 (1990) (holding that the legislature has, when it intended a statute to extend to other territories, clearly stated its intent in the statute.).

The legality of an extra-territorial statute will be reviewed for constitutionality only when there has been a clear expression of a Legislative intention to have the statute applied in such an extraordinary manner, otherwise it is presumed that there is no intention to regulate conduct outside the state's borders.  Thus, "as a general rule, when no such intention is clearly expressed, it is presumed that the statute was intended to be applicable only within the territorial jurisdiction of the enacting governmental body.  73 Am. Jur. 2d, Statutes § 359.  Considering the interstate system as a whole, the better

5

rule is that a local statute should not be given extraterritorial effect so as to regulate conduct in another jurisdiction." Pendell v. AMS/Oil, Inc., 1986 WL 5286, *4 (D. Mass.) There is nothing in M.G.L. Ch. 151B that would reflect any Legislative intent to have M.G.L. Ch. 151B apply to a factory operating outside of Massachusetts, whether in Enfield, Connecticut, or Kalamazoo, Michigan. Therefore, there is no reason or legal justification for even considering applying M.G.L. Ch. 151B to a factory operating outside the borders of Massachusetts.

Moreover, any effort to apply M.G.L. Ch. 151B in such a fashion, to make unlawful conduct in Connecticut that would be lawful in Connecticut, would be unconstitutional. Thus, as noted by the court in deciding that the Massachusetts Civil Rights Act did not apply to conduct outside of Massachusetts:

> In general, there is a presumption against extraterritoriality of statutory application without evidence of legislative intent to the contrary. *See*, Equal Employment Opportunity Commission v. Arabian Amer. Oil Co., 111 S. Ct. 1227, 1230 (1991). In addition, although federal laws sometimes have extraterritorial reach, this feature has been attributed to Congress' constitutional powers to conduct affairs with foreign nations. Id. States, of course, have no such powers.

Doricent v. American Airlines, Inc., 1993 WL 437670, *8 (D. Mass.). Significantly, in Doricent, the availability of injunctive relief, a critical component of M.G.L. Ch. 151B, signified to the court "a lack of legislative intent for extraterritorial reach, since the injunctions of Massachusetts courts can only apply within the territory of the Commonwealth." Id.

In the instant case, these charges seek to use a state law to determine whether to issue an injunction, or other relief, ordering an Enfield employer to make accommodations to certain individuals, individuals that may not even be deemed as handicapped or disabled under Connecticut law. Just as Connecticut could not tell a Massachusetts employer how it must conduct business, Massachusetts has no

authority to order an Enfield employer to engage in specific conduct, or to pay damages for engaging in conduct lawful in Connecticut.  Thus, as the Supreme Court explained in Healy v. Beer Institute, Inc., 491 U.S. 324, 335-337, 109 S. Ct. 2491, 2499-2500 (U.S. Conn., 1989), the constitutional limitations on one state regulating economic activity in another:

> reflect the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres.  Taken together, our cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions:  First, the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," [citations omitted] and, specifically, a State may not adopt legislation that has the practical effect of establishing "a scale of prices for use in other states," [citations omitted].  Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature.  The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. [citations omitted].  Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.  Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State.  [citations omitted]

The limitations on a state's right to control commercial activity outside of its borders was recently relied upon by the First Circuit Court of Appeals, which struck down a state law, the "The Massachusetts Burma Law", because Massachusetts was attempting to regulate conduct beyond its borders . . . ."  National Foreign Trade Council v. Natsios, 181 F.3d 38, 69 (1st Cir. 1999).  The court noted that a law aimed at changing behavior beyond its borders was unconstitutional.  Thus, under the Commerce Clause, as the Supreme Court has held, "one State's power to impose burdens on the

interstate market . . . is not only subordinate to the federal power over interstate commerce but is also constrained by the need to respect the interests of other States". When the effect of a state law is to control commercial activity beyond the border of the state engaging in the regulation, the state law must fall.  Id.

If it is lawful under the ADA and the Connecticut statute for this Connecticut employer to not hire individuals that could not work a continuous operation, Massachusetts law, specifically M.G.L. Ch. 151B, cannot alter that effect.  Accordingly, this claim under M.G.L. Ch. 151B must be dismissed for lack of jurisdiction.

### III.  The Claims Are Preempted by Federal Labor Law

Furthermore, the determination as to which former employees of the closed facilities were entitled to obtain positions at Enfield was governed by a collective bargaining agreement and was the subject of negotiations between Respondent and the co-Respondent Union, representing the Enfield employees whose rights could be affected by the hiring and or transfer of additional employees.  There was, under federal labor law, an obligation to bargain the effects of the closing.  First Nat'l Maintenance Corp. v. NLRB, 452 U.S. 666, 667 n. 15 (employer obligated to bargain about effects of partial cessation); NLRB v. Rapid Bindery Inc., 293 F.2d 170 (2d Cir. 1961) (employer obligated to bargain about affects of economically motivated decision to relocate plant). The co-Defendants here negotiated in good faith as required by federal law, and reached an agreement that covered the effects of the closing, including the rights and limitations on the ability of Springfield employees to obtain positions in Enfield.  That agreement supplements the extant collective bargaining agreement, and is relied upon by the Plaintiffs as a crucial factor in their cases.  However, the fact that this state law claim is premised on the application of an agreement negotiated under the obligations

of the National Labor Relations Act, and that agreement inevitably would have to be interpreted, demonstrates that this state claim is preempted by federal law.

Federal labor law preemption has three spokes. One, <u>Garmon</u> preemption, which derives from <u>San Diego Building Trades Council v. Garmon</u>, 359 U.S. 236 (1959), deprives any court from deciding disputes "[that] is arguably subject to § 7 or § 8 of the [National Labor Relations] Act. However, the two remaining spokes of the federal preemption doctrine are applicable. This includes "<u>Machinist preemption</u>", which is aimed at protecting the bargaining process, and leaving that process substantially "unregulated" as per the desires of Congress. Under that doctrine, state and local governments are prohibited from regulating activities which Congress intended to be left unrestricted by any governmental power. <u>Lodge 76, Int'l Assoc. of Machinists & Aerospace Workers v. Wisconsin Emp. Comm.</u>, 427 U.S. 132, 140, 96 S. Ct. 2548, 2553, 49 L.Ed.2d 396 (1976). Here, Plaintiffs seek to utilize Massachusetts state law to attack the agreement reached by the Respondent and the Respondent Union, an agreement negotiated pursuant to their bargaining obligations under federal law. This would constitute an improper interference with the bargaining process and such an action is preempted[4].

Similarly, the state law claim is preempted here because it would require an interpretation of the collective bargaining agreement and the supplemental closing agreement. This brings into play § 301[5] preemption, premised on the recognition that national labor policy holds that parties are entitled to have the terms of their collective bargaining agreement interpreted by an arbitrator. <u>Martin v. Shaw's Supermarkets, Inc.</u>,

---

[4]Employees are not without remedy if their unions negotiate discriminatory agreements. Such actions have long been held to violate the Union's duty of fair representation under federal law. <u>Steele v. Louisville & Nashville R.R. Co.</u>, 323 U.S. 248, 65 S. Ct. 238, 15 LRRM 697, 9 LC ¶ 51187 (1944).
[5]29 U.S.C. 185.

105 F.3d 40, 41-42 (1st Cir.), *cert. denied*, 118 S. Ct. 69 (1997) (To prevent parties from circumventing this important national labor policy, and avoid courts from interpreting the terms of collective bargaining agreements in the first instance, the doctrine of § 301 preemption developed.).

State law claims are federally preempted not only when the provisions of the collective bargaining agreement are the sources of the claim, but also whenever proper resolution of the claim requires interpretation of the terms of a collective bargaining agreement.  *See,* Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399 (1988). Thus, if judging the Defendant's conduct would require an interpretation of their rights under the provisions of a collective bargaining agreement, the state law claim is preempted.  *See, e.g.*, Jackson v. Liquid Carbonic Corp., 863 F.2d 111 (1st Cir. 1988), *cert. denied*, 490 U.S. 1107 (1989) (Massachusetts action under invasion of privacy statute preempted by federal law when the court would have to interpret the terms of the collective bargaining agreement.).

While not every claim by every employee covered by a collective bargaining agreement is preempted, as the First Circuit Court has noted, "[t]oday, labor-law preemption casts a relatively wide net."  Flibotte, et al. v. Pennsylvania Truck Lines, Inc., 131 F.3d 121 (1st Cir. 1997), *citing,* Lingle v. Norge Div. of Magic Chef, Inc., *supra*. "[T]he basic test remains that prescribed by Lingle and its progeny:  that section 301 preempts a state-law claim, whether founded upon the state's positive or common law, if a court, in passing upon the claim, would be required to interpret the collective bargaining agreement."  Flibotte, at sl. op. 3.  "In practice, this test boils down to whether the asserted state-law claim plausibly can be said to depend upon the meaning of one or more provisions within the collective bargaining agreement".  *Id.*  A claim depends upon a collective bargaining agreement if either it claims a breach of a duty

arising under a collective bargaining agreement, or if resolution of a claim "arguably hinges upon an interpretation of the collective bargaining agreement." _Id._  Since Plaintiffs are attacking the negotiated closing agreement, and its subsequent application, this claim is preempted.[6]

Preemption is applicable to statutory claims under M.G.L. Ch. 151B as well as common law claims.  _See,_ O'Brien v. Consolidated Rail Corporation, 972 F.2d 1 (1st Cir. 1992); _see_, _also,_ Smith v. WGBH Educational Foundation, 144 LRRM 2447, 1993 WL 528438 (D. Mass. 1993); Nuzzo v. Northwest Airlines, Inc., 887 F. Supp. (D. Mass. 1995) (claim under Massachusetts Civil Rights Act preempted by Railway Labor Act); and Downey v. American Airlines, Inc., 141 LRRM 2803, 1992 WL 333969 (D. Mass. 1992).  Moreover, whether or not the statute required a "higher standard" than the contract (such as a duty to make reasonable accommodation) does not affect the scope of preemption.  O'Brien, _supra_, at 4 n. 2.

The collective bargaining agreement and effects bargaining agreement here is unquestionably implicated by Complainant's claims.  Under such circumstances, the Ch. 151B claim is preempted and must be dismissed.

Respectfully Submitted,


  /s/ Jay M. Presser
Jay M. Presser, Esq.
BBO #405760
Counsel for MeadWestvaco Corporation
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts  01144
Dated:   April 27, 2005            Tel. (413) 737-4753/Fax: (413) 787-1941

---

[6]Moreover, preemption is, as the First Circuit Court of Appeals has specifically noted, particularly appropriate when the _reasonableness_ of conduct is at issue.  Sweeney v. Westvaco Corp., 926 F.2d 29, 37 (1st Cir. 1991).

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing *Memorandum in Support of Motion to Dismiss Count II* was served upon the attorney of record for each other party by electronically filing with the court on April 27, 2005.

        /s/ Jay M. Presser
        Jay M. Presser, Esq.