UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANABELA CARVALHO, ANTHONY GITTLES, LAWRENCE PIETRUCCI, RICHARD LaFLECHE, and ROBERT VIEU,<br><br>Plaintiffs,<br><br>vs.<br><br>MEADWESTVACO CORPORATION and UNION, PAPER, ALLIED-INDUSTRIAL, CHEMICAL & ENERGY WORKERS INTERNATIONAL UNION, LOCAL 10001 AND ITS INTERNATIONAL,<br><br>Defendants. | CIVIL ACTION NO. 05-30020-MAP<br><br><br><br>**JOINT PRE-TRIAL MEMORANDUM** |

**I      STATEMENT OF ESTABLISHED FACTS**

1   The Plaintiffs, Anthony Gittles, Anabela Carvalho and Richard LeFleche were hired by the defendant employer or its predecessors (Westvaco or U.S. Envelope), prior to 1988.  The defendant Robert Vieu was hired in approximately 1994.

2   In September of 2002, the employer announced that it would be closing its Springfield plant and that as a part of that closure, some of the Springfield operations would be transferred to the employer's Enfield plant.

3   In approximately 1988, the employer and the Union negotiated an amendment to the collective bargaining agreements titled the "7 Day Memorandum of Agreement."  This amendment allowed the employer to institute "continuous operations" in several of its plants including both the Enfield and Springfield plants. "Continuous operations" refers to operations which run 24 hours per day seven days per week with individuals working regularly assigned 12-hour shifts, rotating between three and four shifts per week.  Employees on continuous operation do not receive overtime unless they work more than forty hours in a week or more than twelve hours in a day.  Thus, employees designated as "continuous operation" employees could be required to work 12-hour shifts.  Prior to November of 2002, the employer did not exercise its right to implement "continuous operations" in its Springfield plants.  It had, however, partially implemented "continuous operations" in its Enfield facility.

4   Under the terms of the "7 Day Memorandum of Agreement", employees who were "hired" prior to the ratification of that agreement in 1988, were "grandfathered" meaning that they could not be required to work continuous operation 12 hour shifts.

5   With the exception of Robert Vieu, all the plaintiffs were "grandfathered" by this provision and did not work continuous operations at any time during their employment with the defendant, MeadWestvaco or its predecessors in interest.  Because Robert Vieu was hired after 1988 he was considered a "continuous operation" employee although he never in fact worked in a continuous operation.

6   Although the defendant had the right to require newly hired employees to work "continuous operations" under the "7 day Memorandum of Agreement" the defendant did not exercise that option in the Springfield plant.

7   Under the terms of the collective bargaining agreements, employees not working "continuous operations" could be required to work "a reasonable number of overtime hours when necessary to meet production needs." (CBA Article VII, Section 7)  Section 7 further stated that:  "An employee refusing an overtime assignment without a sufficient excuse under the circumstances will be subject to progressive discipline in keeping with the contracts "just cause" guarantee."  Id.  This identical language was included in both the Springfield and Enfield Plant collective bargaining agreements.

8   Prior to the Springfield plant closure, a dispute arose between the employer and the plaintiff, Anthony Gittles, concerning overtime.  Mr. Gittles ultimately filed a complaint with the Massachusetts Commission Against Discrimination in 1996 claiming that the employer was failing to accommodate his medical restriction against working in excess of eight (8) hours per day.

9   Each of the remaining Plaintiffs was under the same restriction as Mr. Gittles for several years prior to the closing of the Springfield Plant.  Verification of this work restriction was accomplished through an employer drafted form which asked the employee's treating physician to verify, *inter alia*, that the employee could work at least two (2) eight (8) hour Saturday overtime shifts per month in order to comply with the contractual requirements.

10  There were a number of employees of the employer's Enfield plant who had temporary limitations on the number of hours they could work and the employer accommodated these restrictions.

11  Following the announcement that it was closing the Springfield plant, the Company and the Union engaged in effects bargaining as required by the National Labor Relations Act.  At the time of the announced Springfield plant closure, each plaintiff was under a permanent work restriction which

prohibited them from working more then 8 hours per day although each plaintiff was capable of working at least two (2) eight hour Saturday overtime shifts per month. At the conclusion of the "effects" bargaining, a "Company Offer" was presented to and ratified by the Union membership.

12  Subsequent to ratification of the "Company Offer," management at the Springfield plant began conducting meetings with employees about whether they wished to be considered for an open job in Enfield, or immediately take the closing pay. During plant closure meetings, employees were shown positions and asked to identify which, if any, they sought. Some of these positions identified during these meetings were for eight hour shifts.

13  The company conducted these interviews, to the extent feasible, according to the employees' seniority with the most senior employees being presented with positions prior to less senior employees. By the time the plaintiff Robert Vieu was interviewed more senior employees had indicated a desire for these eight hour shifts.

14  The plaintiffs were not allowed to transfer to the employer's Enfield facility because of their medical restriction and were eventually terminated from employment. The plaintiffs did receive severance payments in accordance with the collective bargaining agreement and the plant closing agreement.

15  Although the employees filed grievances over their termination the Union declined to pursue their grievances to arbitration.

16  For a brief period of time after the plaintiffs' transfer interviews, a few transferees from the Springfield plant to the Enfield plant worked eight (8) hour shifts.

II    CONTESTED ISSUES OF FACT

    A    Plaintiff

1  The evidence will demonstrate that during the course of their employment, plaintiffs Carvalho and LaFleche suffered work related injuries that seriously and permanently impaired major life activities. Both Carvalho and LaFleche were paid Workers' Compensation benefits for their injuries and resulting disabilities. The Plaintiffs Gittles and Vieu although not technically suffering from work related injuries also seriously impaired during their employment. However the evidence will show that at all material times, that each plaintiff was a qualified handicapped individual capable for performing the essential functions of their job with or without reasonable accommodations.

2   The employees of the Springfield and Enfield plants were part of the same collective bargaining unit although they were governed by separate collective bargaining agreements negotiated between the defendant Employer and the defendant Union. The language contained in these Enfield and Springfield collective bargaining agreements was identical.

3   The "7-day Memorandum of Agreement" specifically stated that "current employees will not be required to work the 7 day operation schedule."

4   At the time of the Springfield plant shutdown, there were only a few "continuous operation" shifts in the employer's Enfield plant.

5   After Plaintiff Gittles file a discrimination complaint against his employer in 1996 regarding the employer's failure to accommodate his overtime restriction, the dispute was eventually settled. Under the terms of the settlement, the employer agreed that Mr. Gittles could satisfy his contractual obligation to work "a reasonable number of overtime hours" by working at least two (2) Saturday 8 hour overtime shifts per month. The employer subsequently produced a form for employees with overtime restrictions to medically verify that they could work at least two (2) eight (8) hour Saturday overtime shifts per month in order to satisfy their contractual obligations to work "a reasonable amount of overtime."

6   Prior to the transfer of employees from Springfield to Enfield, the company and the Union engaged in "effects" bargaining concerning the closure of the Springfield plant and the transfer of operations and employees to Enfield. During these discussions, which occurred between October 15 through October 17, 2002, the employer insisted that no one with a "medical restriction" would be allowed to transfer to the Enfield facility. At the time of the announced Springfield plant closure, each plaintiff was under a permanent work restriction which prohibited them from working more then 8 hours per day although each plaintiff was capable of working at least two (2) eight hour Saturday overtime shifts per month.

7   During the plant shutdown discussions between the Union and the employer, management explained that some of the machines transferred to Enfield would be manned by continuous operations (12 hour shifts) while other machines would remain on non-continuous operations and therefore manned by eight (8) hour shifts.

8   At the conclusion of these discussions, the employer produces a document titled "Plant Shutdown Springfield, Flexible Packaging Plants Company Offer" This document enhance severance benefits relating to plant closures which were contained in the Enfield and Springfield collective bargaining agreements. The document also stated "No medical restrictions- employees must perform all essential functions of their job."

9   The Company "Offer" also stated that "Job openings available to employees at the Springfield and Flexible Packaging Plants shall be as shown on the attached list."

10   The Company's "offer" was presented to employees of the Springfield plant and ratified by a wide margin.

11   Subsequent to ratification of the "Company Offer" management at the Springfield plant began conducting employee job transfer interviews. During these interviews, each of the plaintiffs, except Robert Vieu, was offered a choice between an eight (8) hour position in their classification or a 12-hour position in their classification. The plaintiffs were asked to select the shift they desired and to write that shift on a form produced by the employer titled "Springfield Envelope and Flexible Packaging Plant Shutdown Employee Job Transfer Selection Form."

12   Although the Plaintiffs Carvalho, Gittles, and LeFleche were offered eight (8) hour positions, the plaintiff Robert Vieu was told that there were no more eight (8) hour shifts available.

13   The employer has advertised as early as March of 2003 for 40 hour per week positions.

14   None of the transferees who originally worked the eight (8) hour shift in Enfield plant subsequently refused to work continuous operations.

15   a result of the defendant's conduct, the Plaintiffs suffered severe emotional and financial harm for which they are seeking compensation.

### B    Defendant MeadWestvaco

1. Under the National Labor Relations Act the Company was required to negotiate a change in wages, hours and working conditions, including effectuating the changes in hours of work necessary to initiate continuous operations. The "7 Day Memorandum of Agreement" was a compromise achieved as part of collective bargaining. Under the terms of that negotiated compromise, certain employees were "grandfathered", meaning that they could not be required to work continuous operation 12 hour shifts. Since scheduling must be done as crews, this right limited the Company's ability to commence continuous operations. Accordingly, other provisions were simultaneously negotiated that would enhance the company's ability to commence continuous operations. Such compromises included provisions which indicated that all employees hired later would be

deemed continuous operation employees, and even if initially hired for an eight hour shift position, they would have to be able to work continuous operations when the Company was able to commence continuous operations. Further, any grandfathered employees who bid on a continuous operation position would lose their right to refuse to work continuous operations. These provisions were negotiated because the Company viewed continuous operations as more productive, since the machines are always in use, and the Company wanted to have the ability to work continuous operations whenever business conditions allowed for it.

2. Pursuant to both the existing contract language and the plant closing agreement a Springfield employee losing their position might have several options. An employee could accept a vacancy existing at another plant in the local, accept the negotiated closing pay, or accept and try another position for up to 45 days, and then decide to accept the closing pay. Any employee accepting an opening at another plant has plant seniority (except as to vacation and pension credits) effective at the time that they moved to the new plant.

3. When negotiating the plant closing agreement the Company was unwilling to allow individuals to transfer to Enfield if they were unable to work the twelve hour shifts required for continuous operation. This was reflected in the Company's proposal that was submitted by the Union to a vote of the membership, and ratified on October 20, 2005. No employee with a medical restriction other than an inability to work more than eight hours in a day was precluded from accepting a position in Enfield as a result.

4. The Company had a strong desire to commence operations in Enfield on a continuous operation basis to the greatest extent possible at the time of the Springfield plant closing. However, no firm decisions had been reached even when the meetings with employees had been commenced, since the Company was reviewing both whether the business needs would support continuous operations, and whether it would have sufficient staffing available to operate a continuous operation. It takes years to train employees to perform certain functions, and continuous operations require a larger number of employees since all seven days are being staffed. Unless a sufficient number of former Springfield employees in the appropriate job classifications were willing to accept positions in Enfield, the Company would be unable to move to continuous operations as soon as it wanted. The local Union officials were made aware that the decisions as to what specific jobs would be available were in flux, even at the time the Company began to have its meetings with employees.

5. Although the Company had not finalized any decisions yet as to the positions that would be available, following the ratification of the plant closing agreement in individual meetings, employees were shown the positions that, as of that time, appeared to be likely openings and asked to identify which, if any they sought. Some of these positions identified during these meetings were for eight hour shifts, at least until such time that the Company was able to commence continuous operation.

6. By the time Plaintiff Vieu was interviewed more senior employees had indicated a desire for the eight hour shift that at the time appeared to be available. Carvalho was shown and chose an eight hour shift, but more senior employees later returned from vacation and chose the position she identified. Thus, by seniority, she would not have been eligible for any eight hour position in her job classification.

7. During the individual meetings, after indicating their desired position, the Plaintiffs were told they would have to be able to work continuous operations in order to accept a position in Enfield. They were provided an opportunity, if they chose, to review their restrictions with their personal doctors and update or eliminate their restrictions. None of the remaining plaintiffs had their permanent restrictions against working in excess of eight (8) hours in a day lifted.

8. The Union declined to pursue Plaintiffs grievances to arbitration because the Union believed that their terminations by the Company were consistent with the terms of the collective bargaining agreement and the plant closing agreements.

9. Given the seniority date given to employees accepting positions in Enfield, and as understood by the Company and the Union, employees from Springfield accepting positions in Enfield were not entitled to refuse continuous operation positions in Enfield.

10. By mid-November 2002 the Company had determined that it had sufficient staffing and business need to permit continuous operations as they hoped. Some employees who had transferred continued to work for a few weeks during a training period by the 3rd week in January of 2003, each and every employee who had transferred to the Enfield facility was working on continuous operations.

11. None of the Plaintiffs ever subsequently sought to be rehired by the Company for any position.

**III     JURISDICTIONAL QUESTIONS**

    1    The Plaintiff continues to maintain that the State of Massachusetts has jurisdiction over the Plaintiffs' claims for discrimination and therefore the plaintiffs' claims under M.G.L. c. 151B should not have been dismissed and reserves this issue for appeal.

    2.    Defendants maintain that disputes relating to the proper interpretation of the collective bargaining agreement, or the plant closing agreement, cannot be decided in this forum.

**IV     ISSUES OF LAW AND EVIDENTIARY QUESTIONS**

1. Whether the Plaintiffs were qualified handicapped individuals within the meaning of the Americans with Disabilities Act?

2. Whether the Plaintiffs were capable of performing the essential functions of the job within the meaning of the Americans with Disabilities Act?

3. Whether the Plaintiffs were subject to unequal terms and conditions of employment as a result of their handicap?

4. Whether the company's "offer" with respect to the plant closure prohibiting the transfer of employees with any "medical restrictions" to the Enfield facility violated the Americans with Disabilities Act?

5. Whether the applicable collective bargaining agreement exempting the Plaintiffs from "continuous operations" required the defendant to offer the plaintiff non-continuous operation shifts in the Enfield Facility in accordance with their seniority?

6. Whether the applicable collective bargaining agreement exempting the Plaintiffs from "continuous operations" prohibited the employer from converting eight (8) hour transferees to continuous operations without their consent.

7. Whether the Company's Plant closing "offer" effected the plaintiffs' status as "non-continuous employees"

8. The Defendant Company disputes Plaintiff's right to have the terms of the collective bargaining agreement, or the plant closing agreement, interpreted in this forum.

9. Whether the Plaintiffs were capable of performing a "reasonable amount of overtime" as defined by the applicable collective bargaining agreement.

10  The nature and extent of damages incurred by the plaintiffs as a result of the defendant's conduct.

11  Whether all the Plaintiff's were disabled within the meaning of the ADA, and if so, whether they were all qualified disabled employees.

12  Whether the Company violated the ADA when it refused to allow individuals not capable of working the basic twelve hour shifts required for continuous operations to accept positions at its Enfield facility when the Springfield plant was closed.

V   **EVIDENTIARY ISSUES:**

1   The Plaintiff, Anthony Gittles is terminally ill with end stage bone cancer. As such, plaintiff is seeking guidance from the court on how to best preserve his testimony or proceed to trial in an expeditious manner.

VI  **AMENDMENTS TO THE PLEADINGS:**

None at this time

VII **ADDITIONAL MATTERS TO AID IN DISPOSITION OF THE CASE:**

Parties may have outstanding discovery issues that they are currently attempting to resolve.

Parties will be filing cross motions for Summary Judgment.

VIII **PROBABLE LENGTH OF TRIAL**

Three (3) to Five (5) days.

IX  **WITNESSES:**

All named plaintiffs.

The following current or former employees of the defendant, MeadWestvaco:

| | | |
|---|---|---|
| Gloria Jacobowski | John Talumis | Alvin Robinson |
| John Carver | Sandra Gauthier | Tadeuz Dziergowski |
| Stanley Kuskus | Danuta Zywicki | David Orszulak |
| Dorota Pecak | Peter Mancuso | John Maconi |
| John Hatcher | Richard Witherall | Chi Chow |
| Donald Mock | Chris Gordon | Betty Cabrera |
| Jim Davis | | |

The following witness from the Defendant, Union:

Ron Ducalon   John Hatcher

The parties would seek permission to supplement or reduce their list following the court's action on summary judgment.

**EXHIBITS**

**A**   **Plaintiff**

1  Collective bargaining agreements from 1988 through the present and any amendments thereto;

2  Company overtime/medical certification forms; "Company's Offer" with attached list of positions available in Enfield; Notes of employer and Union relating to "effects" bargaining over Springfield plant closure;

3  Plaintiffs' Job Transfer Election Forms w/attached list of positions available in Enfield;

4  Plaintiffs' medical records;

5  Plant closure documents;

6  Employee seniority lists;

7  Medical certification forms;

8  Enfield Payroll records;

9  Company advertisements for 40 hour positions;

10  Plaintiffs' tax and income documents;

**B. Defendant**

In addition to the materials listed by Plaintiff:

a)  Social Security Disability information for Plaintiff.

b) Documents relating to interim earnings by Plaintiffs.

Respectfully Submitted,

For the Plaintiffs

  /s/John D. Connor
John D. Connor, Esquire
Law Offices of Moriarty and Connor, LLC
101 State Street, Suite 501
Springfield, MA 01103
Tel: (413) 827-0777
Fax: (413) 827-8867

For Defendant MeadWestvaco

  /s/ Jay M. Presser
Jay M. Presser, Esq.
BBO #405760
Counsel for MeadWestvaco Corporation
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts 01144
Dated: March 23, 2006
Tel. (413) 737-4753/Fax: (413) 787-1941

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing *Joint Pre-Trial Memorandum* was served upon the attorney of record for each other party by electronically filing with the court on March 31, 2006.

  /s/ Jay M. Presser
Jay M. Presser, Esq.